**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF NEW YORK<br><br>*ex rel.* [UNDER SEAL],<br><br>              Plaintiffs,<br><br>       v.<br><br>[UNDER SEAL],<br><br>            Defendants. | Civ. Action No. _____<br><br>**COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**<br><br>**DEMAND FOR JURY TRIAL** |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF NEW YORK, | Civ. Action No. _____ |
| *ex rel*. JEAN NOLAN, | COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2 |
| Plaintiffs, | |
| v. | DEMAND FOR JURY TRIAL |
| ELDERWOOD HEALTH CARE AT LINWOOD, ELDERWOOD SENIOR CARE, INC., POST ACUTE PARTNERS, AND DOES 1-100, | |
| Defendants. | |

**COMPLAINT**

On behalf of the United States of America and the State of New York, Relator Jean

Nolan files this *qui tam* Complaint against Defendants Elderwood Health Care At Linwood

("Linwood"), Elderwood Senior Care, Inc. ("Elderwood"), Post Acute Partners ("PAP"), and

Does 1-100 (individually, or collectively "Defendants"), and allege as follows:

**INTRODUCTION**

1.     This is an action to recover treble damages and civil penalties on behalf of the

United States of America and the State of New York in connection with a scheme designed to

manipulate Medicare and other government funded insurance programs in order to fraudulently

bill the government for skilled nursing and rehabilitation services, in violation of these programs'

1

requirements and regulations and in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended (the "FCA"), and the New York False Claims Act, N.Y. Fin. Law §§ 187-194 (the "NY FCA").

2.      While working as a Licensed Practical Nurse ("LPN") at Elderwood Health Care at Linwood, relator Jean Nolan ("Relator" or "Nolan") personally observed numerous unlawful and fraudulent practices implemented by Defendants to maximize Medicare and Medicaid payments at the physical expense of patients and at great cost to the government.

3.      Defendants in this action are healthcare providers which administer skilled nursing, long term care, and rehabilitation services to patients covered by the federally and state funded health insurance programs, Medicare, as well as Medicaid and TRICARE.

4.      Nolan personally observed Defendants' knowing, fraudulent practices regarding the admission of patients into rehabilitation programs by leveraging relationships with hospitals to funnel patients to Linwood and admit patients who did not meet the criteria for rehabilitation under CMS guidelines.

5.      Upon admission, Defendants' staff physicians regularly failed to properly assess patients' conditions and individualized needs and failed to prescribe an appropriate level of treatment, as required by the government funded health care programs. Instead, in accordance with Linwood policy, all patients were admitted at the highest, and most expensive, level of treatment initially, with the expectation that they would be seen by a physical therapist within 24 hours. The physical therapists, rather than a physician, then prescribed the level of care for each individual patient. Linwood physicians routinely rubber stamped these evaluations and prescriptions of care.

6.      During the course of her employment at Linwood, Relator personally observed the regular manipulation of applicable Medicare and Medicaid requirements in order to inflate billings to the government through the submission of false claims.  To do so, Defendants regularly provided services for the "treatment" of patients that were not medically reasonable or necessary.  In most cases, Defendants indiscriminately shuffled patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation rates, without regard to particular patients' needs or conditions.

7.      Defendants also held patients with improved conditions for whom rehabilitation was no longer medically necessary or reasonable, or a particular level of care was no longer appropriate, in order to bill at higher rates for as long as possible, and billed for wholly inadequate services that do not qualify for reimbursement under the government funded health insurance programs.

8.      Finally, Nolan personally observed the provision of services that did not qualify for reimbursement as "skilled" under Medicare and Medicaid guidelines, but were fraudulently billed as skilled nursing services by Defendants anyway.

9.      Throughout 2013 to present, Defendants routinely submitted false claims to Medicare, Medicaid, and TRICARE for reimbursement of these non-existent or non-reimbursable services performed at Linwood, and, based on Elderwood's lack of internal controls, throughout the other Elderwood facilities as well.

10.     Beginning around October 2013, Nolan complained about violations to supervisors at Linwood and Defendants' corporate office.  As a result of her complaints and her refusal to engage in illegal practices, Nolan was fired on or about April 29, 2014.  In sum, Defendants' fraudulent conduct and violations of the false claims acts of the United States and of

3

New York, the Federal Government and the State of New York have suffered substantial damages.

## PARTIES

11.     Defendant Elderwood Health Care at Linwood in Lancaster, New York ("Linwood") is a nursing home which provides skilled nursing and sub-acute rehabilitation therapy, among other programs.  Linwood is located at 1818 Como Park Boulevard, Lancaster, NY 14086.

12.     Defendant Elderwood is a health care management firm which operates in New York and has provided skilled nursing under that name since 1978.  Elderwood maintains 17 facilities in Western New York where it provides rehabilitation and skilled nursing services in assisted living and independent living communities for more than 5,000 people each year.

13.     Defendant PAP is headquartered in New York and is a privately held company which owns and operates post acute healthcare facilities in New York, Rhode Island, Pennsylvania, and Massachusetts.  As part of its holdings, PAP owns and operates companies that provide skilled nursing and inpatient rehabilitation, in New York and Rhode Island.  In 2013, PAP acquired nearly all of Elderwood's facilities for approximately $140 million.

14.     Plaintiff is unaware of the true names of certain defendants sued herein under the fictitious names Does 1-100, and will seek leave to amend this complaint to sue such parties by their actual names at such time as plaintiffs become aware of them.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has jurisdiction over the

subject matter of the NY FCA action pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the NY FCA action arises from the same transactions or occurrences as the FCA action.

16.    This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process.  During the time period relevant to this Complaint, each of the defendants resided and transacted business in the Western District of New York, and most of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

17.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of the defendants can be found in, reside in, and transact business in the Western District of New York and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

18.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

19.    Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable William J. Hochul, Jr., United States Attorney for the Western District of New York, and upon the Honorable Eric H. Holder, Attorney General of the United States.

## GENERAL ALLEGATIONS

### I.   FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

#### A.   Medicare

##### 1)   Medicare Background

20.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

21.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

22.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services.  CMS establishes rules for the day-to-day administration of Medicare.  CMS contracts with private companies to handle day-to-day administration of Medicare.

23.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services.  These schedules specify the amounts payable for defined types of medical services and procedures.

24.     The Medicare Benefit Policy Manual defines skilled services as follows:

[s]killed nursing and/or skilled rehabilitation services are those services, furnished pursuant to physician orders, that:

- Require the skills of qualified technical or professional health personnel such as registered nurses, licensed practical (vocational) nurses,

6

physical therapists, occupational therapists, and speech-language pathologists or audiologists; and

- Must be provided directly by or under the general supervision of these skilled nursing or skilled rehabilitation personnel to assure the safety of the patient and to achieve the medically desired result.

Medicare Benefit Policy Manual § 30.2.1.

25.     Subject to conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation per benefit period.  42 U.S.C. § 1395(a)(2)(A); 42 C.F.R. § 409.61(b), (c); Centers for Medicare & Medicaid Services, "Medicare Coverage of Skilled Nursing Facilities," §2: Medicare SNF Coverage, at 18.

26.     For treatment in a skilled nursing or skilled rehabilitation facility to be covered by Part A, all of the following conditions must be met:

(1)     "The patient requires skilled nursing services or skilled rehabilitation services . . . ; are ordered by a physician and the services are rendered for a condition for which the patient received inpatient hospital services or for a condition that arose while receiving care in a [skilled nursing facility] for a condition for which he received inpatient hospital services";

(2)     The patient requires skilled services on a daily basis;

(3)     The services required by the patient can only be provided by a skilled nursing facility; and

(4)     The services are medically reasonable and necessary, "i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice.  These services must also be reasonable in terms of duration and quantity."

Medicare Benefit Policy Manual Ch. 8, § 30; 42 U.S.C. § 1395(a)(2)(B); 42 C.F.R. § 409.31(b).

27.     In addition, Medicare Part A will only cover services which are medically reasonable and necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1); 42 U.S.C. § 1320c-5(a)(2).

28.     Medicare uses a pre-determined daily rate under its prospective payment system ("PPS") for skilled nursing and rehabilitation services provided to qualifying patients.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

29.     On whether a nursing service is skilled, the Medicare Benefit Policy Manual provides: "If the inherent complexity of a service prescribed for a patient is such that it can be performed safely and/or effectively only by or under the general supervision of skilled nursing or skilled rehabilitation personnel, the service is a skilled service; e.g., the administration of intravenous feedings and intramuscular injections; the insertion of suprapubic catheters; and ultrasound, shortwave, and microwave therapy treatments."  Medicare Benefit Policy Manual § 30.2.2.

30.     The Medicare Benefit Policy Manual explains the difference between skilled and non-skilled physical therapy as follows: "When services can be safely and effectively performed by supportive personnel, such as aides or nursing personnel, without the supervision of a physical therapist, they do not constitute skilled physical therapy.  Additionally, services involving activities for the general good and welfare of the patient (e.g., general exercises to promote overall fitness and flexibility and activities to provide diversion or general motivation) do not constitute skilled physical therapy." Medicare Benefit Policy Manual § 30.4.1.

31.     Medicare pays nursing facilities a pre-determined daily rate per its prospective payment system ("PPS"), which depends, in part, on a patient's Resource Utilization Group ("RUG").  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998); *see also* 70 Fed. Reg. 45,026, 45,031 (Aug. 4, 2005).  There are five general RUG levels for rehabilitation therapy: Rehab Ultra High, Rehab Very High, Rehab High, Rehab Medium, and Rehab Low.

**B.**     **Medicaid**

32.     Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients.  Medicaid was created in 1965 in Title XIX of the Social Security Act.

33.     Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

34.     At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

**C.**     **TRICARE**

35.     TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the federal government.

36.     At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

37.     Medicare, Medicaid, and TRICARE, and other similar federal programs are referred to collectively herein as "federal health insurance programs."

## SPECIFIC ALLEGATIONS

38.     Relator Nolan is an experienced LPN who has worked in the industry for over 14 years.  Throughout that time, she has worked at multiple facilities, including facilities which provide skilled nursing care and required knowledge of applicable regulations.

39.     In April of 2013, Nolan began working as a nurse on the night shift at Linwood on a per diem basis.  Approximately two weeks later, Nolan began working as a full-time LPN

on night shifts at Linwood. Throughout the course of her employment at Linwood, she

personally observed the following fraudulent practices:

- **Patient admissions into rehabilitation programs**. Defendants admit patients who did not meet the criteria for rehabilitation programs and bill for those services.  In addition, Defendants' doctors did not actually assess patients' conditions and individualized needs and prescribe an appropriate level of treatment, as required by the government funded health care programs, resulting, effectively, in the blind approval of patients for more expensive care.

- **Fraudulent manipulation of applicable requirements to "treat" patients for whom services were not medically reasonable or necessary**. Defendants improperly shuffle patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation rates.  Defendants also held patients for whom rehabilitation was no longer medically necessary or reasonable to be able to bill at those higher rates for as long as possible.  In addition, Defendants would not provide or would inadequately provide rehabilitation services for which they billed.

- **Defendants fraudulently billing for skilled nursing services.**  Defendants inflated what they billed Medicare, Medicaid, and TRICARE by billing for skilled nursing services when those providing the services were unqualified and/or unsupervised to provide the services or treatment.

40.     As a result of these fraudulent practices, described in more detail below,

Defendants have submitted false billings to the government funded health care programs in

violation of the FCA and NY FCA.

## II.    FRAUDULENT PRACTICES WITH REGARD TO PATIENT ADMISSION IN REHABILITATION PROGRAMS

41.     Defendants leverage relationships with hospitals in order to funnel patients into

their programs without regard to whether those patients meet the applicable criteria for

rehabilitation.

42.     Defendants had an unwritten policy: "fill the beds" and justify admission later.

Officially, the facility mandated that all patients were admitted to the hospital at "Total Assist of

Two," the highest and most expensive level of treatment, irrespective of their condition, and

were required to see a physical therapist, not a doctor, within 24 hours of admission. The physical therapist then determined the appropriate level of care for the patient, who had already been admitted, scaling back the level of care from "Total Assist of Two" if necessary.  Relator is not aware of any doctors employed by Defendant questioning a physical therapists' diagnosis or prescription of treatment; rather, Linwood physicians routinely rubber stamp patients' charts without properly evaluating those patients, as required.

43.     By admitting patients without proper evaluations at the highest level of treatment, Defendants violated regulations under Medicare as well as New York State law, and inflated billings to federal and New York State funded health care programs in violation of the False Claims Acts.

A.     <u>Admitting patients who do not meet the criteria for rehabilitation programs and billing for those services</u>

44.     PAP owns and operates Elderwood facilities, including the facility at Linwood and employs internal personnel in charge of marketing for all of the facilities.

45.     In this role, the marketing team is in charge of patient recruiting from other hospitals and facilities throughout New York and oversees Elderwood's patient recruiting effort.

46.     Elderwood's patient recruiting is premised on relationships with hospitals throughout New York in order to funnel patients into Elderwood's rehabilitation programs, irrespective of whether those patients meet the applicable Medicare eligibility criteria set forth in 42 U.S.C. § 1395(a)(2)(A) and 42 C.F.R. § 409.61(b), (c).

47.     Elderwood routinely wrongfully admits patients into the rehabilitation program who could not participate in or benefit from rehabilitation such as elderly patients, patients suffering from dementia, and those who were too sick to meet the rigorous daily rehabilitation requirements under Medicare and Medicaid.

48.     For example, Elderwood admitted Patient A into its rehabilitation program even though she suffered from debilitating cancer with limited mobility and no chance of physical improvement.  Patient A could not swallow and weighed approximately seventy five pounds at six feet tall.  She remained in rehab until she accrued the maximum covered 100 days under Medicare, when she was immediately  placed in hospice and died approximately two weeks later.

49.     Relator is personally aware that Elderwood admitted numerous patients to its rehabilitation program despite being too frail from old age, or too weak due to illness.  These patients could not and often did not regularly participate in any effective rehabilitation, yet Elderwood admitted and billed for them anyway.

50.     By admitting and billing the government for the treatment of patients who did not meet the applicable eligibility criteria, Defendants submitted and caused the government to pay false claims.

**B.      Defendants caused doctors to rubber stamp placements in the higher billed rehabilitation instead of actually assessing patients, as required**

51.     A physician or other qualified practitioner must certify and re-certify that Medicare eligibility criteria are satisfied.  42 U.S.C. § 1395(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

52.     Under New York State law, "[u]pon admission and periodically thereafter," a facility must conduct "comprehensive, accurate, standardized, reproducible" assessments of patients' functional capacity and use those assessments as the basis for individualized comprehensive care plans tailored to each residents' needs.  Public Health Law § 2803(2), section 415.11.  The assessments must include, among other things, the patients' discharge potential and rehabilitation potential.  *Id.*

53.     Once a recruited patient was directed to an Elderwood facility, however, doctors failed to perform the required evaluation to determine eligibility.  Physicians commonly signed certifications without evaluating the patients.

54.     Instead, doctors sign-off on their admission for treatment without regard to the patients' condition.

55.     Often, doctors signed-off on admissions without even meeting with or evaluating the patient at all.  Rather, as discussed above, physical therapists met with patients, evaluated their condition, and prescribed a level of treatment for them during their stay at the facility.  Doctors simply reviewed the patient charts, in many cases, and signed off on the physical therapists' prescription of care without conducting a proper evaluation.

56.     Relator Nolan personally observed that patients were admitted and treated who were clearly ineligible for rehabilitation.  Moreover, once admitted, the treatment plan was not tailored or adjusted.  Based on her experience, and independent assessments, doctors could not have evaluated many of the admitted patients because those patients so clearly were not eligible for rehab due to their deteriorating, and in some cases terminal, condition.

57.     For example, Patient B was a patient in her 80's with bilateral pneumonia who was admitted into the rehabilitation program.  She was so sick that just days after her admission she was transferred back to the hospital.  Patient B's admission into the rehabilitation program indicates either that no doctor evaluated her, or that a doctor evaluated her and placed her into the rehabilitation program even though she was severely ill and could not participate in or benefit from rehabilitation services.  Patient B should not have been admitted to rehab, and Medicare should not have paid for her treatment because she was not eligible.

13

58.     In another example, Patient C had a broken ankle but was otherwise self sufficient and mobile with the use of a wheel chair.  Patient C's mobility even allowed him to frequently to run off-site errands with weekend passes.  Due to the cast on his foot, however, Patient C could not effectively participate in rehabilitation.  Notwithstanding, Defendants kept Patient C in the rehabilitation program, billing the government for his treatment.

59.     Relator is personally aware of numerous other examples of patients admitted to Elderwood that were not or could not have been properly evaluated by a physician.  If they had, the physician would have determined that, at least at the time of admission, those patients were not eligible for rehabilitation services.

60.     By failing to provide required assessments, Defendants billed the government for more expensive treatments which were neither medically reasonable nor necessary in light of the patients' actual condition.

61.     Despite these improper admissions, Defendants continued to fraudulently bill for the patients' care, submitting false claims to the Government in violation of the false claims acts.

## III.    MANIPULATING REQUIREMENTS TO TREAT PATIENTS FOR WHOM SERVICES WERE NOT MEDICALLY REASONABLE OR NECESSARY

62.     As stated above, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation per benefit period subject to certain conditions.  42 U.S.C. § 1395(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

63.     A condition of coverage is that care must be medically reasonable and necessary, including with regard to duration and quantity of treatment.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30.  Generally, services or treatments are medically reasonable or necessary if they "are consistent with the nature and severity of the individual's illness or injury, the

individual's particular medical needs, and accepted standards of medical practice," and are reasonable in duration and quantity.  Medicare Benefit Policy Manual, Ch. 8, § 30.

64.     Defendants routinely billed the government for care that was not neither reasonable nor medically necessary under CMS guidelines in violation of the false claims act.

### A.     Improperly shuffling patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation billing rates

65.     Defendants engaged in a scheme to maximize the number of days it billed Medicare, Medicaid, and TRICARE for rehabilitation services, which is reimbursed at a higher rate than long term care.

66.     On the date that funding is reissued, Defendants put patients back in the rehabilitation program for an additional one hundred days, irrespective of their condition.

67.     Medicare requires that a doctor or other qualified practitioner certify and re-certify on a regular basis that a patient needs skilled rehabilitation services.  *See* 42 U.S.C. s. 1395f(a)(2)(B); *see also* Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

68.     Once admitting a patient into skilled rehabilitation care, doctors employed by Defendants failed to re-certify or fraudulently re-certified their need for ongoing care.

69.     Instead, admitted patients were left in skilled rehabilitation for the maximum amount of covered days without regard to their individualized needs.  As soon as the particular patient had finished his or her allotted coverage for rehabilitation, Defendants moved that patient into long term care irrespective of the patient's particular needs.  Many patients still at the facility at the time their rehabilitation coverage was reissued were  immediately placed back into the higher billed rehabilitation program.

70.    For example, Patient D was a patient in her late 70's who was placed in the rehabilitation program until she reached the maximum coverage even though she did not require those services.  She was immediately placed in long term care as soon as she no longer had rehabilitation coverage under Medicare.  Patient D was walking with a walker during the time she was in the rehabilitation program but rapidly declined within a matter of days to the point that she required total assistance from two nurses to handle every menial task.  Patient D's daughter spoke with Relator and requested that her mother be placed in the rehabilitation program to allow her mother to regain mobility and a level of independence.  Relator sent a note to Defendants relaying the request.  Unknown to Patient D, Linwood had needlessly and recklessly used all of the allocated days for rehabilitation coverage, precluding her from obtaining treatment when she actually needed it.

71.    Defendants' treatment decisions were governed by the availability of coverage for more expensive treatment.  The type of services provided, whether rehabilitation or skilled nursing, were indicated by the color of patients' charts.  This practice was so pervasive that staff would joke about the changing colors of charts depending on the time of year.

72.    By keeping patients in skilled rehabilitation for the maximum amount of covered days without regard to their individualized needs, Defendants caused the government to pay for services that were neither medically reasonable nor necessary through the submission of false claims.  Defendants also caused physical harm to patients by putting their own financial gain above the individualized needs of patients.

16

**B.** **Improperly holding patients for whom rehabilitation was no longer medically necessary or reasonable and billing at higher, inaccurate rates for as long as possible**

73.     Defendants routinely required patients to remain in their rehabilitation program for the maximum time permitted under federal regulations in order to bill at the higher rehabilitation rate.

74.     Defendants accomplished this by routinely billing for one hundred days of rehabilitative care – the maximum amount permitted – irrespective of the patients' actual condition or diagnosis.

75.     In addition, Defendants billed for services which a patient could not reasonably be expected to participate in or benefit from, in light of their individual condition.  For example, as discussed above, Defendants billed for Patient A's rehabilitation treatment even though once she reached the maximum amount of coverage,  she was placed in hospice and died approximately two weeks later.

76.     Defendants also routinely billed for treatment that was well beyond that required by the patient.  Defendants had a practice of rarely, if ever, designating a patient as being "independent" until the day they were discharged from the facility.

77.     Relator estimates that approximately 90% of patients in the rehabilitation program remained at a the higher level of "supervision" when, in fact, they were functioning at "independent," necessitating a lower, and less expensive, level of care.

78.     For example, Patient E was cleared for discharge and was fully mobile and independent.  However, Patient E remained in the rehabilitation program for an additional five days, even though she was up and walking around the room and informed Relator that she did not need any help.  Elderwood kept Patient E longer than necessary in order to continue billing the Government for her care.

17

79.     Defendants maintained an internal system for charting and billing patients that indicated the level of intensity and supervision for a particular patient's care.  Under this system, Elderwood staff determined the level of care at admission based on the patient's condition and designated the patient on the following categories: (1) Independent; (2) Supervision; (3) Limited Assist of One; (4) Limited Assist of Two; (5) Total Assist of One; and, (6) Total Assist of Two. The more assistance required, the higher the billable rate – total assist of two meaning that the patient needed two nurses to assist with nearly every task that required the patient to get out of bed.

80.     Relator is personally aware that under this system, Defendants not only routinely inflated that level of care required for patients, but regularly ignored patient improvement, keeping patients at their initial designation throughout the course of their stay.  Defendants' conduct resulted in numerous patients receiving well above the standard of care reasonable and necessary to treat their condition.

81.     In one example, Patient F was an overweight patient in her mid-forties who needed the assistance of one person to assist with bed mobility.  Notwithstanding, Defendants designated Patient E at Total Assist of 2, needlessly requiring the complete assistance of two people.  The Total Assist of 2 designation allowed Elderwood to bill for her care at a higher rate. Despite Relator reporting that the patient did not need to be at Total Assist of 2, Elderwood kept her at that level of care in order to maximize its billing of the Government.

82.     Similarly, Defendants' internal policies discouraged or punished nurses from indicating improving conditions on patients' charts.  For example, if Relator found a patient walking around independently and reflected that on the chart as an improvement, Relator would be disciplined or "written up" for a care plan violation.  Instead, Defendants required staff to

treat those instances as patient behavioral issues who disregarded instructions. This allowed Defendants to continue billing at higher rates.

83.     Relator repeatedly left notes on patients' charts and in daily reports indicating that a patient did not require the level of care indicated on the chart, but those notes were ignored.

84.     By keeping patients in skilled rehabilitation for the maximum amount of covered days without regard to their individualized needs and the appropriateness of a treatment plan, Defendants caused the government to pay for services that were neither medically reasonable nor necessary.

**C.      <u>Failing to Provide or Inadequately Providing Rehabilitation Services</u>**

85.     Often during the night shift, Relator spoke with patients about their conditions, the status of their care, and the day-to-day activities they participated in.  Through these discussions, Relator became aware that patients were not receiving meaningful rehabilitation services or, in some instances, they were not receiving rehabilitation services at all.

86.     For example, Nolan spoke with numerous patients being billed for rehabilitation services who regularly told her that they had not participated in any rehabilitation activities on a given day.  Relator is aware of several patients who could not meaningfully participate in rehabilitation due to their condition but they remained charted for and billed out as rehabilitation patients.

87.     Other patients informed Relator that they received sham rehabilitation as a result of the wholly inadequate services Linwood was capable of providing due to its substandard rehabilitation facility and equipment.  For example, numerous patients informed Relator that they only completed ten minutes of rehabilitation therapy or that they merely walked up and down a set of stairs for the duration of their treatment on a given day.

88.     By providing inadequate physical therapy, Defendants caused harm to patients and caused the government to pay for services which were either not medically reasonable or necessary, or not in fact provided.

## IV.    FRAUDULENT BILLING OF SKILLED NURSING SERVICES TO INFLATE WHAT DEFENDANTS BILLED MEDICARE, MEDICAID, AND TRICARE

89.     A skilled service is one that is "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a); *see* 42 C.F.R. § 409.31(a).

90.     Under New York State law, facilities must have sufficient nursing staff and related services "to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident, as determined by resident assessments and individual plans of care. The facility shall assure that each resident receives treatments, medications, diets and other health services in accordance with individual care plans."  Public Health Law, section 415.13.

91.     Defendants routinely billed for skilled nursing services when, in fact, qualified practitioners were not performing those services or supervising those performing the services or treatment.  Defendants did so in order to inflate what Defendants billed Medicare, Medicaid, and TRICARE.

92.     Further, Relator personally observed and was required to provide skilled nursing care and treatments required of an RN to patients without any supervision by necessity, as no appropriate professional was available.

93.     On a routine basis, Defendants failed to staff the facility with a practitioner qualified to provide many skilled nursing services, particularly for night shifts.   To the extent there was an appropriate person on call, they were frequently located off site and often

unavailable.  However, Defendants would bill for skilled nursing services when there was no person working who met the qualifications necessary to bill for certain skilled care.

94.     For example, one night during Relator's shift, she disagreed with the Director of Nursing because the Director of Nursing wanted to go home and asked Relator to take the keys to – and accompanying responsibility for – the facility's supply of narcotics for both skilled nursing and rehabilitation patients.  Relator explained that given the limited staff, she felt she could not handle both responsibilities if there were an emergency.  The Director of Nursing disregarded Relator's concerns and told her that nothing would happen and to take the keys and "step up to the plate."  That night, Patient G repeatedly asked for the evening RN and at some point began "coding."  Relator called the RN on call, but they were on vacation and did not respond, and called an ambulance to take her to a facility where should could receive appropriate care.  Given the severity of the emergent situation, Relator had to enlist help of aids, a nursing student and a new graduate, because the facility was woefully understaffed with qualified professionals that evening.

95.     By improperly staffing its facilities and by permitting and/or requiring unqualified professionals to provide skilled nursing services, Defendants caused harm to patients and submitted inflated, false claims to the government as the treatment did not qualify for coverage under CMS guidelines.

## V.     RELATOR COMPLAINS ABOUT VIOLATIONS AND IS FIRED AS A RESULT

96.     Beginning around October 2013, Relator reported a number of these violations to supervisors and staff at Linwood, including to Defendants' corporate office.  In both cases, her complaints were greeted with complete silence or outward hostility.

97.     Relator also discussed her concerns with one of her superiors at Linwood, including the Direct of Nursing, and specifically stated that she didn't want to do anything that would compromise her license.  The superior responded "don't give me that license bull ****."

98.     As a result of her complaints and refusal to engage in illegal practices, Relator was retaliated against.  Initially, management began taking away shifts from her, resulting in a significant loss of income.  Her superiors also created a very uncomfortable working environment for her, refusing to speak to her or reprimanding her for conduct as a pretext for her termination. On or about April 29, 2014, Relator was finally terminated.

99.     Relator believes that the response she received by the highest officers of the company, and the utter lack of controls within the company, demonstrate that the conduct described herein is much more pervasive that what she experienced at Linwood and likely occurring company-wide.

## VI.   DAMAGE SUSTAINED BY THE GOVERNMENT

100.    By premising its treatment of Medicare, Medicaid, and TRICARE patients on billing the maximum amount, without reference to the patient's actual individual condition or needs, Defendants billed significantly more than the treatment which was medically reasonable and necessary.

101.    Defendants' practices ignored patient needs and were to the patients' detriment, as they resulted in beneficiaries unnecessarily exhausting all 100 days of covered treatment under Part A, leaving patients with no covered option for at least 60 days if they actually needed skilled nursing or rehabilitation care.

102.    Based her experience at Linwood, and her understanding of corporate policy and the operations of the other Elderwood facilities, Relator is informed and believes that the conduct

alleged herein was not limited to Linwood, but took place at other Elderwood facilities throughout the State of New York.

103.    As a result of this conduct, Relator believes that Defendants have fraudulently billed the government for tens of millions of dollars in fraudulent services.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)**

104.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

105.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

106.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT II**
**False Claims Act: Making or Using A False Record**
**or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2)**

107.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

108.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used,

a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the defendants – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

109.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III
### New York False Claims Act,
### N.Y. Fin. Law §§ 187, et seq.: Presentation of False Claims

110.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

111.     As more particularly set forth in the foregoing paragraphs, Defendants "knowingly present[ed], or cause[d] to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval," in violation of N.Y. Fin. Law § 189.1(a)

112.     Unaware of the falsity of claims presented or caused to be presented, the New York state government has paid and continues to pay the claims that would not have been paid but for the fraudulent acts and conduct of Defendants.

113.     By reason of Defendants' fraudulent acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COUNT IV**
**New York False Claims Act,**
**N.Y. Fin. Law §§ 187, et seq.: Making or Using A False Record**
**or Statement to Cause Claim to be Paid**

114.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

115.    Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government," in violation of N.Y. Fin. Law § 189.1(b).

116.    Unaware of the falsity of records or statements knowingly made, used, or caused to be made or used by Defendants, the New York state government has paid and continues to pay the claims that would not have been paid but for the acts and conduct of Defendants.

117.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COUNT V**
**RETALIATION (31 U.S.C. § 3730(h))**

118.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

119.    By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of her employment after she lawfully reported what she believed to be fraudulent conduct or wrongdoing to her superiors and corporate representatives in violation of 31 U.S.C. § 3730(h).

120.    Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the federal claims:

a.       Three times the amount of damages that the Government sustains because of the acts of Defendants;

b.       A civil penalty of $11,000 for each violation;

c.       An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

d.       Award of an amount for reasonable expenses necessarily incurred;

e.       Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

f.       Interest;

g.       Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section (h) claim;

h.       Such further relief as the Court deems just; and

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the New York claims:

a.       Relator and the State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by New York as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within New York, as provided by N.Y. Fin. Law § 189.1(g);

b.      Relator be awarded her Relator's share of any judgment to the maximum amount provided pursuant to N.Y. Fin. Law § 190.6;

c.      Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees as provided pursuant to N.Y. Fin. Law § 190.7; and

d.      Relator and the Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands trial by jury.


Dated: February 2, 2015

Respectfully submitted,

STONE & MAGNANINI LLP

By: _____
    Robert A. Magnanini
    David B. Harrison
    Danielle F. Moriber
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
Tel.: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com
dharrison@stonemagnalaw.com
dmoriber@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*