**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF NEW YORK, <br><br> *ex rel*. JEAN NOLAN, <br><br>          Plaintiffs, <br><br>      v. <br><br> POST ACUTE PARTNERS MANAGEMENT, LLC, 1818 COMO PARK BOULEVARD OPERATING CO., LLC, AND ELDERWOOD ADMINISTRATIVE SERVICES, LLC, <br><br>          Defendants. | **Civ. Action No. 15-CV-0099(S)** <br><br> **SECOND AMENDED COMPLAINT DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT

    Relator Jean Nolan, by and through her counsel, files this Second Amended Complaint

against Defendants Post-Acute Partners Management, LLC ("PAPM"), 1818 Como Park

Boulevard Operating Co., LLC, and Elderwood Administrative Services, LLC (individually, or

collectively as "Defendants" or "Elderwood"), and alleges as follows:

## INTRODUCTION

    1.    This is an action for damages on behalf of Relator Jean Nolan for retaliation in

connection with her internal reporting of fraudulent conduct that gave rise to violations of the

Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended (the "FCA"), and the New

York False Claims Act, N.Y. Fin. Law §§ 187-194 (the "NY FCA").

2.       On August 2, 2022, the Department of Justice announced a settlement of the

underlying FCA action brought by Relator Nolan, which included a $950,000 payment by

several affiliates of Defendant Elderwood scattered throughout New York State.  As described in

the announcement:

> The Government alleges that between August 1, 2013, and December 31, 2018,
> Elderwood knowingly submitted, or caused to be submitted, false claims for payment to
> Medicare for physical therapy, occupational therapy, and speech therapy services that
> were medically unnecessary. The submission of these medically unnecessary claims
> resulted in Elderwood receiving artificially inflated payments from Medicaid.

3.       Elderwood is a New York based skilled nursing and rehabilitation company with

ten locations throughout the state – Amherst, Cheektowaga, Grand Island, Hamburg, Hornell,

Lancaster, Liverpool, Waverly, Wheatfield, and Williamsville.

4.       While working as a Licensed Practical Nurse ("LPN") at 1818 Como Park

Boulevard Operating Co., LLC, referred to as Elderwood at Lancaster ("Lancaster"), relator Jean

Nolan ("Relator" or "Nolan") personally observed numerous unlawful and fraudulent practices

implemented by Defendants to fraudulently maximize Medicare and Medicaid payments at the

physical expense of patients and at great cost to the Government.

5.       Defendants in this action are healthcare providers which administer skilled

nursing, long term care, and rehabilitation services to patients covered by the federally and state

funded health insurance programs, Medicare, as well as Medicaid and TRICARE.

6.       Nolan personally observed Defendants' knowing, fraudulent practices regarding

the admission of patients into rehabilitation programs by leveraging relationships with hospitals

to funnel patients to Elderwood facilities and admit patients who did not meet the criteria for rehabilitation under CMS guidelines.

7.      Upon admission, Defendants' staff physicians regularly failed to properly assess patients' conditions and individualized needs and failed to prescribe an appropriate level of treatment, as required by the government funded health care programs.  Instead, in accordance with Elderwood policy, all patients were admitted at the highest, and most expensive, level of treatment initially with the expectation that they would be seen by a physical therapist within 24 hours.  The physical therapists, rather than a physician, then prescribed the level of care for each individual patient.  Elderwood physicians routinely rubber stamped these evaluations and prescriptions of care.

8.      During the course of her employment at Lancaster, Relator personally observed the regular manipulation of applicable Medicare and Medicaid requirements in order to inflate billings to the Government through the submission of false claims.  To do so, Defendants regularly provided services for the "treatment" of patients that were not medically reasonable or necessary.  In most cases, Defendants indiscriminately shuffled patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation rates, without regard to particular patient's needs or conditions.

9.      Defendants also held patients with improved conditions for whom rehabilitation was no longer medically necessary or reasonable, or a particular level of care was no longer appropriate, in order to bill at higher rates for as long as possible, and billed for wholly inadequate services that do not qualify for reimbursement under the government funded health insurance programs.

8.    Finally, Nolan personally observed the provision of services that did not qualify for reimbursement as "skilled" under Medicare and Medicaid guidelines, but were fraudulently billed as skilled nursing services by Defendants anyway.

9.    Throughout 2013 to present, Defendants routinely submitted false claims to Medicare, Medicaid, and TRICARE for reimbursement of these non-existent or non-reimbursable services performed at Elderwood.  Further, Elderwood encouraged and directed its staff to perpetuate the false claims by manipulating patient records and Relator observed this practice at Lancaster which led her to believe this fraudulent conduct pervaded the entire Elderwood system, and as it did at Lancaster, persisted unchecked throughout the course of her employment.   Indeed, Relator learned that similar conduct was being perpetrated at the other Elderwood facilities, including Hamburg where patients are being moved into medically unnecessary disciplines of treatment and kept for longer than medically necessary in order to maximize revenue.

10.    Beginning around October 2013, Nolan complained about violations to supervisors at Lancaster and Elderwood's corporate office.  These complaints specifically included, among other things, the deliberate falsification of medical records to avoid scrutiny over Elderwood's inflated rehabilitation services.  As a result of her complaints and refusal to engage in illegal practices, Elderwood retaliated against Nolan.  First, she was treated with hostility and threatened, but when she continued to speak up about the improper practices, her position was changed in order to reduce her exposure to the violative conduct and thus her ability to view and report the conduct.  When she reported the improper conduct to upper management, her supervisors created a pretext for her termination, and ultimately did in fact terminate her on or about April 29, 2014.

11.     In sum, as a result of the retaliation on Ms. Nolan for internally reporting improper conduct that amounted to violations of the FCA and the NYFCA and for refusing to comply with instructions to cooperate in Defendants' scheme to defraud the Government, Ms. Nolan suffered harm.  This Second Amended Complaint seeks damages in connection with that harm under 31 U.S.C. § 3730(h) and N.Y. Fin. Law § 191.

### PARTIES

12.     Defendant PAPM, headquartered in New York, is a privately held company that owns and operates facilities that provide post-acute healthcare services, including skilled nursing and inpatient rehabilitation, in New York, Rhode Island, Pennsylvania, and Massachusetts.  In 2013, PAPM acquired nearly all of Elderwood's facilities, and specifically the facilities named in this complaint, for approximately $140 million.  PAPM seeks to establish a complete continuum of care for post-acute services, including by pursuing employee training and company culture initiative for its subsidiary facilities.

13.     Defendant Elderwood Administrative Services, LLC was acquired by PAPM in 2013.  It is a health care management firm that has provided skilled nursing in New York since 1978.  Elderwood owns and operates rehabilitation, skilled nursing, assisted living and independent living communities in Western New York, with 17 facilities, including the facilities named in this complaint, 2,800 beds and 4,000 employees.  Elderwood has ten skilled nursing and rehabilitation facilities, including Amherst, Cheektowaga, Grand Island, Hamburg, Hornell, Lancaster, Liverpool, Waverly, Wheatfield, and Williamsville.

14.     Defendant 1818 COMO PARK BOULEVARD OPERATING CO., LLC is a New York Limited Liability Company located in Lancaster, NY.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has jurisdiction over the subject matter of the NY FCA action pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the NY FCA action arises from the same transactions or occurrences as the FCA action.

16.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  During the time period relevant to this Complaint, each of the defendants resided and transacted business in the Western District of New York, and most of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

17.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of the defendants can be found in, reside in, and transact business in the Western District of New York and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

18.     In accordance with 31 U.S.C. § 3730(b)(2), the initial complaint was filed *in camera* and remained under seal for a period of at least 60 days and was not served on the Defendants until the Court so orders.

19.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator provided the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint.

7

Relator complied with this provision by serving copies of this Complaint upon the Honorable

William J. Hochul, Jr., United States Attorney for the Western District of New York, and upon

the Honorable Loretta Lynch, Attorney General of the United States.

**GENERAL ALLEGATIONS**

I.     **FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS**

     A.     **Medicare**

          1)     **Medicare Background**

20.     Medicare is a federally-funded health insurance program for the elderly and

persons with certain disabilities, providing both hospital insurance, Medicare Part A, which

covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical

insurance, Medicare Part B, which covers the cost of the physician's services such as services to

patients who are hospitalized, if the services are medically necessary and personally provided by

the physician.

21.     Medicare payments come from the Medicare Trust Fund, which is funded

primarily by payroll deductions taken from the United States work force through mandatory

Social Security deductions.

22.     Medicare is generally administered by the Centers for Medicare and Medicaid

Services ("CMS"), which is an agency of the Department of Health and Human Services.  CMS

establishes rules for the day-to-day administration of Medicare.  CMS contracts with private

companies to handle day-to-day administration of Medicare.

23.     CMS, through contractors, maintains and distributes fee schedules for the

payment of physician services.  These schedules specify the amounts payable for defined types

of medical services and procedures.

24.     The Medicare Benefit Policy Manual defines skilled services as follows:

[s]killed nursing and/or skilled rehabilitation services are those services, furnished pursuant to physician orders, that:

- Require the skills of qualified technical or professional health personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech-language pathologists or audiologists; and

- Must be provided directly by or under the general supervision of these skilled nursing or skilled rehabilitation personnel to assure the safety of the patient and to achieve the medically desired result.

Medicare Benefit Policy Manual § 30.2.1.

25.     Subject to conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation per benefit period.  42 U.S.C. § 1395(a)(2)(A); 42 C.F.R. § 409.61(b), (c); Centers for Medicare & Medicaid Services, "Medicare Coverage of Skilled Nursing Facilities," §2: Medicare SNF Coverage, at 18.

26.     For treatment in a skilled nursing or skilled rehabilitation facility to be covered by Part A, all of the following conditions must be met:

(1)     "The patient requires skilled nursing services or skilled rehabilitation services . . . ; are ordered by a physician and the services are rendered for a condition for which the patient received inpatient hospital services or for a condition that arose while receiving care in a [skilled nursing facility] for a condition for which he received inpatient hospital services";

(2)     The patient requires skilled services on a daily basis;

(3)     The services required by the patient can only be provided by a skilled nursing facility; and

(4)     The services are medically reasonable and necessary, "i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice.  These services must also be reasonable in terms of duration and quantity."

Medicare Benefit Policy Manual Ch. 8, § 30; 42 U.S.C. § 1395(a)(2)(B); 42 C.F.R. § 409.31(b).

27.     In addition, Medicare Part A will only cover services which are medically reasonable and necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1); 42 U.S.C. § 1320c-5(a)(2).

28.     Medicare uses a pre-determined daily rate under its prospective payment system ("PPS") for skilled nursing and rehabilitation services provided to qualifying patients.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

29.     On whether a nursing service is skilled, the Medicare Benefit Policy Manual provides: "If the inherent complexity of a service prescribed for a patient is such that it can be performed safely and/or effectively only by or under the general supervision of skilled nursing or skilled rehabilitation personnel, the service is a skilled service; e.g., the administration of intravenous feedings and intramuscular injections; the insertion of suprapubic catheters; and ultrasound, shortwave, and microwave therapy treatments."  Medicare Benefit Policy Manual § 30.2.2.

30.     The Medicare Benefit Policy Manual explains the difference between skilled and non-skilled physical therapy as follows: "When services can be safely and effectively performed by supportive personnel, such as aides or nursing personnel, without the supervision of a physical therapist, they do not constitute skilled physical therapy.  Additionally, services involving activities for the general good and welfare of the patient (e.g., general exercises to promote overall fitness and flexibility and activities to provide diversion or general motivation) do not constitute skilled physical therapy." Medicare Benefit Policy Manual § 30.4.1.

31.     Medicare pays nursing facilities a pre-determined daily rate per its prospective payment system ("PPS"), which depends, in part, on a patient's Resource Utilization Group ("RUG").  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998); *see also* 70 Fed. Reg. 45,026,

45,031 (Aug. 4, 2005).  There are five general RUG levels for rehabilitation therapy: Rehab Ultra High, Rehab Very High, Rehab High, Rehab Medium, and Rehab Low.

### B.   **Medicaid**

32.    Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients.  Medicaid was created in 1965 in Title XIX of the Social Security Act.

33.    Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

34.    At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

### C.   **TRICARE**

35.    TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the federal government.

36.    At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

37.    Medicare, Medicaid, and TRICARE, and other similar federal programs are referred to collectively herein as "federal health insurance programs."

### SPECIFIC ALLEGATIONS

38.    Relator Nolan is an experienced LPN who has worked in the skilled nursing and long term care industry for over 20 years.  Throughout that time, she worked at multiple facilities, including facilities which required knowledge of applicable regulations.

39.     In April of 2013, Nolan began working as a nurse on the night shift at Lancaster on a per diem basis.  Approximately two weeks later, Nolan began working as a full-time LPN on night shifts at Lancaster. Throughout the course of her employment at Lancaster, she personally observed the following fraudulent practices:

- **Patient admissions into rehabilitation programs**. Defendants admit patients who did not meet the criteria for rehabilitation programs and bill for those services.  In addition, Defendants' doctors did not actually assess patients' conditions and individualized needs and prescribe an appropriate level of treatment, as required by the government funded health care programs, resulting, effectively, in the blind approval of patients for more expensive care.

- **Fraudulent manipulation of applicable requirements to "treat" patients for whom services were not medically reasonable or necessary**. Defendants treated patients with rehabilitation services for whom those services were not medically necessary or who could not meaningfully participate in the rigorous treatment prescribed due to their debilitating condition.  Defendants also improperly shuffled patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation rates.  Defendants also held patients for whom rehabilitation was no longer medically necessary or reasonable to be able to bill at those higher rates for as long as possible.  In addition, Defendants would not provide or would inadequately provide rehabilitation services for which they billed.   In many cases, Relator and other skilled nurses at Lancaster were directed to fraudulently omit information from the patient records in order to conceal the extent of Lancaster's inflated rehabilitation services.

- **Defendants' fraudulently billing for skilled nursing services.**  Defendants inflated what they billed Medicare, Medicaid, and TRICARE by billing for skilled nursing services when those providing the services were unqualified and/or unsupervised to provide the services or treatment.

40.     During the course of her employment with Elderwood, Relator also became aware that Elderwood had been conducting the same or similar fraudulent conduct at its other facilities. For example, Relator learned that the senior staff at Hamburg also manipulated treatment levels and shifted patients from one discipline to another (rehabilitation to long term care) depending on reimbursement levels and availability for a given patient.  The Hamburg facility also held

12

patients for rehab or long-term care until their Medicare coverage expired, irrespective of the patients' condition or improvement.

41.     As a result of these fraudulent practices, described in more detail below, Defendants submitted false billings to the government funded health care programs in violation of the FCA and NY FCA.

## II.     FRAUDULENT PRACTICES WITH REGARD TO PATIENT ADMISSION IN REHABILITATION PROGRAMS

42.     Defendants leveraged relationships with hospitals in order to funnel patients into their programs without regard to whether those patients meet the applicable criteria for rehabilitation.

43.     Defendants had an unwritten policy: "fill the beds" and justify admission later. Officially, the facility mandated that all patients were admitted to the hospital at "Total Assist of Two," the highest and most expensive level of treatment, irrespective of their condition, and were required to see a physical therapist, not a doctor, within 24 hours of admission. The physical therapist then determined the appropriate level of care for the patient, who had already been admitted, scaling back the level of care from "Total Assist of Two" only if necessary. Relator is not aware of any doctors employed by Defendant questioning a physical therapists' diagnosis or prescription of treatment; rather, Lancaster physicians routinely rubber stamp patients' charts without properly evaluating those patients, as required.

44.     By admitting patients without proper evaluations at the highest level of treatment, Defendants violated regulations under Medicare as well as New York State law, and inflated billings to federal and New York State funded health care programs in violation of the False Claims Acts.

A.      **Admitting patients who do not meet the criteria for rehabilitation programs and billing for those services**

45.      PAPM owns and operates all Elderwood facilities, including the facility at Lancaster, and employs internal personnel in charge of marketing for all of the facilities.

46.      In this role, the marketing team is in charge of patient recruiting from other hospitals and facilities throughout New York and oversees Elderwood's patient recruiting effort.

47.      Elderwood's patient recruiting is premised on relationships with hospitals throughout New York and is designed to funnel patients into Elderwood's rehabilitation programs, irrespective of whether those patients meet the applicable Medicare eligibility criteria set forth in 42 U.S.C. § 1395(a)(2)(A) and 42 C.F.R. § 409.61(b), (c).

48.      Elderwood facilities routinely and fraudulently admit patients into the rehabilitation program who could not participate in or benefit from rehabilitation such as elderly patients, patients suffering from dementia, and those who were too sick to meet the rigorous daily rehabilitation requirements under Medicare and Medicaid.  Many of these patients nevertheless were prescribed rehabilitations treatments at the highest RUG levels in order to falsely maximize billings to the Government.

49.      For example, Elderwood Lancaster admitted Patient A into its rehabilitation program even though she suffered from debilitating cancer with limited mobility and no chance of physical improvement.  Patient A could not swallow and weighed approximately seventy-five pounds at six feet tall.  She remained in rehab until she accrued the maximum covered 100 days under Medicare, when she was immediately placed in hospice and died approximately two weeks later.

50.      Relator is personally aware that Elderwood admitted numerous patients to its rehabilitation program despite being too frail from old age, or too weak due to illness.  These

14

patients could not and often did not regularly participate in any effective rehabilitation, yet Elderwood admitted and billed for them anyway.

51.     By admitting and billing the Government for the treatment of patients who did not meet the applicable eligibility criteria, Defendants submitted and caused the Government to pay false claims.

**B.      Defendants caused doctors to rubber stamp placements in the higher billed rehabilitation instead of actually assessing patients, as required**

52.     A physician or other qualified practitioner must certify and re-certify that Medicare eligibility criteria are satisfied.  42 U.S.C. § 1395(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

53.     Under New York State law, "[u]pon admission and periodically thereafter," a facility must conduct "comprehensive, accurate, standardized, reproducible" assessments of patients' functional capacity and use those assessments as the basis for individualized comprehensive care plans tailored to each residents' needs.  Public Health Law § 2803(2), section 415.11.  The assessments must include, among other things, the patients' discharge potential and rehabilitation potential.  *Id.*

54.     Once a recruited patient was directed to an Elderwood facility, however, doctors failed to perform the required evaluation to determine eligibility.  Physicians commonly signed certifications without evaluating the patients.

55.     Instead, doctors sign-off on their admission for treatment without regard to the patients' condition.

56.     Often, doctors signed-off on admissions without even meeting with or evaluating the patient at all.  Rather, as discussed above, physical therapists met with patients, evaluated their condition, and prescribed a level of treatment, often the highest and most expensive level of

treatment, for them during their stay at the facility.  Doctors simply reviewed the patient charts, in many cases, and signed off on the physical therapists' prescription of care without conducting a proper evaluation.

57.     Relator Nolan personally observed that patients were admitted and treated who were clearly ineligible for rehabilitation.  Moreover, once admitted, the treatment plan was not tailored or adjusted in accordance with patients' condition or improvement as required by law. Based on her experience, and independent assessments, doctors could not have evaluated many of the admitted patients because those patients so clearly were not eligible for rehab due to their deteriorating, and in some cases terminal, condition.

58.     For example, Patient B was a patient in her 80's with bilateral pneumonia who was admitted into the rehabilitation program.  She was so sick that just days after her admission she was transferred back to the hospital.  Patient B's admission into the rehabilitation program indicates either that no doctor evaluated her, or that a doctor evaluated her and placed her into the rehabilitation program even though she was severely ill and could not participate in or benefit from rehabilitation services.  Patient B should not have been admitted to rehab, and Medicare should not have paid for her treatment because she was not eligible.

59.     In another example, Patient C had a broken ankle but was otherwise self-sufficient and mobile with the use of a wheelchair.  Patient C's mobility even allowed him to frequently to run off-site errands with weekend passes.  Due to the cast on his foot, however, Patient C could not effectively participate in rehabilitation.  Notwithstanding, Defendants kept Patient C in the rehabilitation program, billing the government for his rehabilitation treatment.

60.     Relator is personally aware of numerous other examples of patients admitted to Elderwood that were improperly admitted and received medically unnecessary rehabilitation services in violation of CMS guidelines.

61.     Despite these improper admissions, Defendants continued to fraudulently bill for the patients' care, submitting false claims to the Government in violation of the False Claims Acts.

## III.     MANIPULATING REQUIREMENTS TO TREAT PATIENTS FOR WHOM SERVICES WERE NOT MEDICALLY REASONABLE OR NECESSARY

62.     As stated above, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation per benefit period subject to certain conditions.  42 U.S.C. § 1395(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

63.     A condition of coverage is that care must be medically reasonable and necessary, including with regard to duration and quantity of treatment.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30.  Generally, services or treatments are medically reasonable or necessary if they "are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice," and are reasonable in duration and quantity.  Medicare Benefit Policy Manual, Ch. 8, § 30.

64.     Defendants routinely billed the government for care that was neither reasonable nor medically necessary under CMS guidelines in violation of the false claims act.

### A.     Improperly shuffling patients between long term care and rehabilitation programs in order to take advantage of higher rehabilitation billing rates

65.     Defendants engaged in a scheme to maximize the number of days it billed Medicare, Medicaid, and TRICARE for rehabilitation services, which is reimbursed at a higher rate than long term care.

66.     On the date that funding is reissued, Defendants put patients back in the rehabilitation program for an additional one hundred days, irrespective of their condition. Relator personally observed this pattern at Lancaster, and is also aware that it occurred regularly at Hamburg as well as other Elderwood facilities.

67.     Medicare requires that a doctor or other qualified practitioner certify and re-certify on a regular basis that a patient needs skilled rehabilitation services.  *See* 42 U.S.C. s. 1395f(a)(2)(B); *see also* Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

68.     Once admitting a patient into skilled rehabilitation care, doctors employed by Defendants failed to re-certify or fraudulently re-certified their need for ongoing care.

69.     Instead, admitted patients were left in skilled rehabilitation for the maximum amount of covered days without regard to their individualized needs.  As soon as the particular patient had finished his or her allotted coverage for rehabilitation, Defendants moved that patient into long term care irrespective of the patient's particular needs.  Many patients still at the facility at the time their rehabilitation coverage was reissued were immediately placed back into the higher billed rehabilitation program.

70.     For example, Patient D was a patient in her late 70's who was placed in the rehabilitation program until she reached the maximum coverage even though she did not require those services.  She was immediately placed in long term care as soon as she no longer had rehabilitation coverage under Medicare.  Patient D was walking with a walker during the time she was in the rehabilitation program but rapidly declined within a matter of days to the point that she required total assistance from two nurses to handle every menial task.  Patient D's daughter spoke with Relator and requested that her mother be placed in the rehabilitation

18

program to allow her mother to regain mobility and a level of independence.  Relator sent a note

to Defendants relaying the request.  Unknown to Patient D, Lancaster had needlessly and

recklessly used all of the allocated days for rehabilitation coverage, precluding her from

obtaining treatment when she actually needed it.

71.     Defendants' treatment decisions were governed by the availability of coverage for

more expensive treatment.  The type of services provided, whether rehabilitation or skilled

nursing, were indicated by the color of patients' charts.  This practice was so pervasive that staff

would joke about the changing colors of charts depending on the time of year.

72.     By keeping patients in skilled rehabilitation for the maximum amount of covered

days without regard to their individualized needs, Defendants caused the Government to pay for

services that were neither medically reasonable nor necessary through the submission of false

claims.  Defendants also caused physical harm to patients by putting their own financial gain

above the individualized needs of patients.

**B.**     **Improperly holding patients for whom rehabilitation was no longer medically necessary or reasonable and billing at higher, inaccurate rates for as long as possible**

73.     Defendants routinely required patients to remain in their rehabilitation program

for the maximum time permitted under federal regulations in order to bill at the higher

rehabilitation rate.

74.     Defendants accomplished this by routinely billing for one hundred days of

rehabilitative care – the maximum amount permitted – irrespective of the patients' actual

condition or diagnosis.

75.     In addition, Defendants billed for services which a patient could not reasonably be

expected to participate in or benefit from, in light of their individual condition.  For example, as

discussed above, Defendants billed for Patient A's rehabilitation treatment even though once she

reached the maximum amount of coverage, she was placed in hospice and died approximately two weeks later.

76.     Defendants also routinely billed for treatment that was well beyond that required by the patient.  Defendants had a practice of rarely, if ever, designating a patient as being "independent" until the day they were discharged from the facility.

77.     Relator estimates that approximately 90% of patients in the rehabilitation program remained at a higher level of "supervision" when, in fact, they were functioning at "independent," necessitating a lower, and less expensive, level of care.

78.     For example, Patient E was cleared for discharge and was fully mobile and independent.  However, Patient E remained in the rehabilitation program for an additional five days, even though she was up and walking around the room and informed Relator that she did not need any help.  Elderwood kept Patient E longer than necessary in order to continue billing the Government for her care.

79.     Defendants maintained an internal system for charting and billing patients that indicated the level of intensity and supervision for a particular patient's care.  Under this system, Elderwood staff determined the level of care at admission based on the patient's condition and designated the patient on the following categories: (1) Independent; (2) Supervision; (3) Limited Assist of One; (4) Limited Assist of Two; (5) Total Assist of One; and, (6) Total Assist of Two. The more assistance required, the higher the billable rate – i.e. total assist of two meant that the patient needed two nurses to assist with nearly every task that required the patient to get out of bed.

80.     Relator is personally aware that under this system, Defendants not only routinely inflated that level of care required for patients, but regularly ignored patient improvement,

keeping patients at their initial designation throughout the course of their stay.  Defendants'

conduct resulted in numerous patients receiving well above the standard of care reasonable and

necessary to treat their condition.

81.     In one example, Patient F was an overweight patient in her mid-forties who

needed the assistance of one person to assist with bed mobility.  Notwithstanding, Defendants

designated Patient E at Total Assist of 2, needlessly requiring the complete assistance of two

people.  The Total Assist of 2 designation allowed Elderwood to bill for her care at a higher rate.

Despite Relator reporting that the patient did not need to be at Total Assist of 2, Elderwood kept

her at that level of care in order to maximize its billing of the Government.

82.     Similarly, Defendants' internal policies discouraged or punished nurses from

indicating improving conditions on patients' charts.  For example, if Relator found a patient

walking around independently and reflected that on the chart as an improvement, Relator would

be disciplined or "written up" for a care plan violation.  Instead, Defendants required staff to

treat those instances as patient behavioral issues who disregarded instructions. This allowed

Defendants to continue billing at higher rates.  This conduct directly violates CMS regulations

governing rehabilitation reimbursements regarding improving conditions.

83.     Relator repeatedly left notes on patients' charts and in daily reports indicating that

a patient did not require the level of care indicated on the chart, but those notes were ignored.

84.     By keeping patients in skilled rehabilitation for the maximum amount of covered

days without regard to their individualized needs and the appropriateness of a treatment plan,

Defendants caused the government to pay for services that were neither medically reasonable nor

necessary.

### C.   <u>Failing to Provide or Inadequately Providing Rehabilitation Services</u>

85.   Often during the night shift, Relator spoke with patients about their conditions, the status of their care, and the day-to-day activities they participated in.  Through these discussions, Relator became aware that patients were not receiving meaningful rehabilitation services or, in some instances, they were not receiving rehabilitation services at all.

86.   For example, Relator spoke with numerous patients being billed for rehabilitation services who regularly told her that they had not participated in any rehabilitation activities on a given day.  Relator is aware of several patients who could not meaningfully participate in rehabilitation due to their condition but they remained charted for and billed out as rehabilitation patients.

87.   Other patients informed Relator that they received sham rehabilitation as a result of the wholly inadequate services Elderwood was capable of providing due to its substandard rehabilitation facility and equipment.  For example, numerous patients informed Relator that they only completed ten minutes of rehabilitation therapy or that they merely walked up and down a set of stairs for the duration of their treatment on a given day.

88.   By providing inadequate physical therapy, Defendants caused harm to patients and caused the government to pay for services which were either not medically reasonable or necessary, or not in fact provided.

### IV.   <u>FRAUDULENT BILLING OF SKILLED NURSING SERVICES TO INFLATE MEDICARE, MEDICAID, AND TRICARE BILLINGS</u>

89.   A skilled service is one that is "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a); *see* 42 C.F.R. § 409.31(a).

90.     Under New York State law, facilities must have sufficient nursing staff and related services "to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident, as determined by resident assessments and individual plans of care. The facility shall assure that each resident receives treatments, medications, diets and other health services in accordance with individual care plans."  Public Health Law, section 415.13.

91.     Defendants routinely billed for skilled nursing services when, in fact, qualified practitioners were not performing those services or supervising those performing the services or treatment.  Defendants did so in order to inflate what Defendants billed Medicare, Medicaid, and TRICARE.

92.     Further, Relator personally observed and was required to provide skilled nursing care and treatments required of an RN to patients without any supervision by necessity, as no appropriate professional was available.

93.     Routinely, Defendants failed to staff the facilities with a practitioner qualified to provide many skilled nursing services, particularly for night shifts.   To the extent there was an appropriate person on call, they were frequently located off site and often unavailable.  However, Defendants would bill for skilled nursing services when there was no person working who met the qualifications necessary to bill for certain skilled care.

94.     For example, one night during Relator's shift, she disagreed with the Director of Nursing because the Director of Nursing wanted to go home and asked Relator to take the keys to – and accompanying responsibility for – the facility's supply of narcotics for both skilled nursing and rehabilitation patients.  Relator explained that given the limited staff, she felt she could not handle both responsibilities if there were an emergency.  The Director of Nursing disregarded Relator's concerns and told her that nothing would happen and to take the keys and

"step up to the plate."  That night, Patient G repeatedly asked for the evening RN and at some

point began "coding."  Relator called the RN on call, but they were on vacation and did not

respond, and called an ambulance to take her to a facility where she could receive appropriate

care.  Given the severity of the emergent situation, Relator had to enlist help of aids, a nursing

student and a new graduate, because the facility was woefully understaffed with qualified

professionals that evening.

95.     By improperly staffing its facilities and by permitting and/or requiring unqualified

professionals to provide skilled nursing services, Defendants caused harm to patients and

submitted inflated, false claims to the government as the treatment did not qualify for coverage

under CMS guidelines.

## V.     RELATOR INTERNALLY REPORTS VIOLATIONS AND IS FIRED IN RETALIATION

96.     Defendants concealed the fraudulent conduct described herein through false

patient charts and records manipulated by nursing staff at the direction of management.

97.     Relator objected to this practice on several occasions during the course of her

employment and reported this practice both to her immediate supervisors at Lancaster and to

Elderwood's corporate office.

98.     In both cases, when Relator reported the concealment, she was instructed to

falsely manipulate patient charts by omitting information about her patient's mobility,

independence, and the lack of need for intense rehabilitation services, she was confronted with

hostility.

99.     Although not immediately apparent, Relator later came to understand that a

reason for the hostility and ultimately her termination was because of her unwillingness to

participate in the billing scheme and her reporting of the improper conduct to Defendants' upper management.

100.    In September 2013, Relator first expressed concern to Lancaster's Director of Nursing, Deb Wainwright, that patients were frustrated that they were, unusually, being woken up in the middle of the night to take medication.  Relator Nolan also reported her concerns that patients were receiving higher and more intense levels of treatment than was appropriate given their independence and mobility, as alleged herein.  In addition to her own observations, Relator also expressed patient frustration with the levels of treatment that were disproportionate to their condition.

101.    In both cases, Ms. Wainwright directed Relator to immediately stop recording patients' frustrations with care on their charts.  Ms. Wainwright further directed Relator to not record that patients are independent or freely walking around their rooms, because this contradicted the high levels of daily treatment that these patients were receiving.

102.    In retaliation, Ms. Wainwright subsequently reassigned Relator's shift to a later shift, apparently to prevent Ms. Nolan from treating patients during the day, where she could observe and chart the patients' mobility, which contrasted with the medically unnecessary treatments they were being given.

103.    Within just a few days of this initial meeting with Ms. Wainwright, Lancaster staff began treating Relator with hostility.

104.    On or about October 9, 2013, Relator was written up for failing to follow through with an order purportedly from a doctor pertaining to a treatment to be administered to a patient. Relator never received such order from her immediate supervisor.  Relator's immediate supervisor contacted Ms. Wainwright and asked where the order came from because it was not

communicated to Relator. Ms. Wainwright responded that "it doesn't matter where the order came from." Ms. Wainwright failed to answer the reasonable inquiry from Relator, nevertheless, the write-up was placed in Relator's employment file. The "write-up" of Ms. Nolan was in direct retaliation for her reporting of concerns concerning Elderwood's improper inflation of services to patients.

105.    Lancaster's frustration with Relator continued to grow as she continued to raise concerns about its questionable practices. During Relator's shift on or about December 13, 2013, she was ordered by Ms. Wainwright to manage the controlled substances on site and act as a supervisor, a task meant to be performed by a Registered Nurse. Relator attempted to refuse to comply with the order because she was not qualified to handle such responsibilities. Despite Relator's attempt to refuse to comply with the order, Ms. Wainwright forced her to manage her normal responsibilities and those of a supervisor. Relator was berated by Ms. Wainwright for her refusal to comply with the orders.

106.    On or about February 7, 2014, Relator contacted the company's corporate office to share her experiences with Lancaster's management, in particular, the retaliation for her refusal to cooperate with the improper practices related to medically unnecessary services for independent and/or mobile patients.

107.    On or about February 9, 2014, Relator met with corporate representatives in person and expressed how she felt targeted by upper management at Lancaster and feared she would lose her job by attempting to perform her job ethically. She also reported that she believed that the conduct at the Lancaster facility was unethical and potentially illegal, which included the false reporting of patient information to conform with inflated treatment levels.

108.    On or about February 16, 2014, Relator was contacted by Administrator Denise Bothwell. During this meeting, Ms. Bothwell asked Relator, "how dare you go to corporate." Relator responded by informing Ms. Bothwell that she endeavors to perform her job ethically to maintain her license. Ms. Bothwell irately responded, "Don't give me that license story, I've heard that before."

109.    On or about April 8, 2014, Relator was informed by Wainwright and Bothwell that she was suspended purportedly for an incident that occurred on or about April 4, 2014. During the incident, Relator's supervisor ordered Relator to wake a patient up at 4am to administer a blood sugar test. The supervisor wanted Relator to take the test even though the patient was not showing any signs or symptoms of hyperglycemia or hypoglycemia.  The request was completely unreasonable, had no medical or clinical basis, and on information and belief was a contrived attempt to manufacture a pretext for punishing Relator.  The suspension was clearly in retaliation for her reporting Lancaster's misconduct and Relator believes a pretext for her ultimate termination.

110.    During a phone call on or about April 11, 2014, Ms. Wainwright and Ms. Bothwell threatened Relator, "One more wrong move and you're out." Relator Nolan understood this threat to directly relate to her internal reporting and non-compliance with Elderwood's fraudulent business practices.

111.    That same day Relator had a follow-up meeting with a representative from corporate during which she once again confirmed the improper conduct described herein, among other misconduct, that resulted in retaliation by her supervisors.

112.    On or about April 12, 2014, Relator received a notice of warning for the events that transpired on April 4, 2014. Once again, she understood this warning to be part of an

27

ongoing effort to falsely record a pretextual basis for her ultimate termination in her employment file.

113.    On or about April 21, 2014, Relator contacted corporate in an email to explain how the claims of insubordination from management at Lancaster felt retaliatory. Relator expressed that she was still facing an uncomfortable work environment,

114.    Relator met with corporate on or about April 23, 2014 and reiterated that management continued to make Lancaster an uncomfortable work environment for Relator.

115.    On or about April 25, 2014, Relator was terminated from her position at Lancaster.  While the basis for her termination was the "false reporting" of retaliation and discrimination, based on her internal reports of unethical business practices, the orchestrated termination was a direct result of her compliance complaints.

116.    As a result of Defendants' retaliatory conduct, Relator Nolan has suffered direct harm.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **RETALIATION (31 U.S.C. § 3730(h)**

117.    Relator repeats and incorporates by reference the allegations above as if fully contained herein

118.    Relator engaged in protected activity when she reported that patients were receiving higher and more intense levels of treatment that was appropriate given their independence and mobility to Lancaster's Director of Nursing, Deb Wainwright and when she reported to a corporate representative that management at Lancaster were engaging in unethical and potentially illegal activities.

119.    Defendants knew Relator reported the illegal activity since Relator reported the activity to Lancaster's Director of Nursing, Deb Wainwright and to the Company's corporate representatives.

120.    Relator was retaliated against by Lancaster management for reporting illegal activity when, among other things, Relator had her responsibilities and shift change, directly in response to her complaints about the improper request to falsify medical records, was written up on or about October 9, 2013 for purportedly failing to follow through on a doctor's order even though the order was never communicated to Relator, when Lancaster management created an uncomfortable and hostile environment for Relator, when Relator was suspended on or about April 8, 2014, when Relator received a notice of warning on or about April 12, 2014, and when Relator was discharged from her position on or about April 25, 2015 in violation of 31 U.S.C. § 3730(h).

121.    Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## COUNT II

## RETALIATION (N.Y. Fin. Law § 191)

122.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

123.    Relator engaged in lawful activity through her efforts to stop Defendants from continuing to partake in unlawful and unethical behavior when she reported that patients were receiving higher and more intense levels of treatment that was appropriate given their independence and mobility to Lancaster's Director of Nursing, Deb Wainwright and Elderwood's corporate representatives.

124.     After reporting illegal activity and attempting to stop Defendant's behavior, Relator was retaliated against by Lancaster management when, among other things, Relator had her responsibilities and shift change, directly in response to her complaints about the improper request to falsify medical records, was written up on or about October 9, 2013 for purportedly failing to follow through on a doctor's order even though the order was never communicated to Relator, when Lancaster management created an uncomfortable and hostile environment for Relator, when Relator was suspended on or about April 8, 2014, when Relator received a notice of warning on or about April 12, 2014, and when Relator was discharged from her position on or about April 25, 2015 in violation of N.Y. State Fin. Law § 191.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally,

a.     Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section (h) claim;

b.     Such further relief as the Court deems just; and

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally:

a.      Such relief as is appropriate under the provisions of New York State Financial Law § 191, including: (1) payment of two times back pay, (2) plus interest and litigation costs and (3) reasonable attorneys' fees in connection with Relator's Section 191 claim.

b.      Relator and the Plaintiffs shall be awarded such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands trial by jury.

Dated: January 17, 2023                           Respectfully submitted,

                                                  SPIRO HARRISON & NELSON

                                                  By: *David Harrison*
                                                       David B. Harrison
                                                       363 Bloomfield Avenue, Suite 2C
                                                       Montclair, New Jersey 07042
                                                       Tel.: (973) 232-0881
                                                       Fax: (973) 232-0887